**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DENNIS E. ROBERGE<br>KRISTI S. ROBERGE<br>Plaintiffs | * | |
| VS. | * | Civil Action No.<br>3:15-cv-01262 (WWE) |
| AMICA MUTUAL INSURANCE COMPANY<br>Defendant | * | October 21, 2015 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS**

NOW COME the plaintiffs, Dennis E. Roberge and Kristi S. Roberge (hereinafter collectively referred to as "the Roberges"), and submit the following Memorandum of Law in Opposition to the defendant, Amica Mutual Insurance Company's (hereinafter "Amica"), Motion to Dismiss.

## INTRODUCTION

This controversy concerns Amica's failure to indemnify the Roberges for damage to their home covered by a policy of homeowner's insurance issued by Amica and purchased by the Roberges. The Roberges purchased the property at 132 Zeya Drive, Coventry, Connecticut in August of 1993. First Amended Complaint, Document No. 9, ¶ 5. The home was built in 1984. *Id.* In the spring of 2015, the Roberges noticed the severe degradation of what they thought to be a simple cosmetic patch of a series of horizontal and vertical cracks throughout most of the basement walls of their home. *Id.* at ¶ 8. The Roberges immediately undertook an investigation

ORAL ARGUMENT REQUESTED

of the condition, its cause, and the methods of repair by consulting with various contractors in the late spring and early summer of 2015. *Id.* at ¶ 9. Upon further inquiry into the condition, its cause, and the method of repair the Roberges discovered that the form of "pattern cracking" found in their basement walls was caused by the presence of a chemical compound found in certain basement walls constructed with concrete most likely mixed by the J.J. Mottes Company in the late 1980s and early 1990s. *Id.* at ¶ 10-11. This particular chemical compound is found in the aggregate of the concrete and will – with its mixture with the water, sand, and cement necessary to form the concrete – begin to oxidize and expand, breaking the bonds of the concrete internally and reducing the concrete to rubble. *Id.* at ¶ 11. There is no known scientific or engineering method or process effective in reversing the deterioration. *Id.* at ¶ 12-13. It is only a matter of time until the basement walls of the Roberges' home fall in, which will in turn cause the entire house to fall into the basement. *Id.* at ¶ 15-17.

All of the insurance policies issued by Amica to the Roberges contain clear language providing coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following…(b) Decay, of a building or any part of a building, that is hidden from view;…or (f) Use of defective material or methods in construction, remodeling or renovation." Exhibit A, form HO 00 03 05 11 page 7 of 24, as amended by form HO 01 06 01 13, page 1 of 4. This "collapse" provision would appear to provide coverage for the Roberges' claim. A collapse has occurred due to the substantial impairment of their basement walls.[1] Complaint ¶ 15. Further, this collapse appears to be the result of a covered peril – decay that is hidden from view or the use of defective materials in

[1] For purposes of Connecticut law, a "collapse" occurs when there has been a substantial impairment to the structural integrity of a building. *Beach v. Middlesex Ins. Co.*, 205 Conn. 246, 252 (1987).

construction. First Amended Complaint ¶ 21-24; Exhibit A, form HO 00 03 05 11 page 7 of 24, as amended by form HO 01 06 01 13, page 1 of 4.

Having observed the cracking condition and learning of its significance the Roberges made a timely claim for coverage to Amica on July 15, 2015, under the terms of one or more of the policies issued during the years Amica covered the Roberges' home. First Amended Complaint, Doc. 9, ¶ 18-20. Amica began investigation of the Roberges' claim and dispatched an engineer to inspect their home. *Id.* at ¶ 25. At this point in time no coverage decision has been made by Amica, however, Amica has earlier denied factually identical claims and the Roberges fully expect that it will attempt to avoid liability for their claim in a similar manner. *Id.* at ¶ 27. The Roberges, therefore, filed this action seeking a declaration as to Amica's duty to provide coverage for the damage suffered to their home under the terms of one or more of the policies issued by Amica. *Id.* at 18-20. Amica's motion to dismiss the complaint followed on September 15, 2015.

**ARGUMENT**

Amica seeks to dismiss the Roberges' complaint. In doing so, Amica misapplies both the standards for insurance policy interpretation and the standards for pleading. First, the Roberges submit that the term "foundation", now asserted by Amica to exclude their claim, is ambiguous and must be construed against Amica and in favor of coverage. Second, the Roberges suggest that the use of the term "footing" in other unrelated policy provisions does not undercut prior precedent of this Honorable Court finding the term "foundation" to be ambiguous. Third, the Roberges have met their pleading burden by offering a short and plain statement of their claim that gives Amica fair notice of their claim and the grounds upon which it rests. Finally, the

Roberges assert that they have adequately pleaded that they have suffered a covered loss during the period of time that their home was covered by Amica.

**I. <u>Standard for Ruling on a Motion to Dismiss.</u>**

The Federal Rules require only that a plaintiff plead "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) *citing Conley v. Gibson*, 355 U.S. 41, 47 (1957). While a complaint must contain enough factual content to state a claim that is plausible on its face, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). This plausibility standard is not a "probability requirement." *Id.*

While *Twombly* marked a departure from prior pleading standards it did not apply a "heightened pleading standard." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 569 n. 14 (2007). In particular, a plaintiff may satisfy the plausibility requirement with allegations made "upon information and belief" particularly where facts are within the possession and control of the defendant. *Artisa Records LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010). A plaintiff does not need to plead with facts with exquisite detail, but must at least provide enough facts to raise a reasonable expectation that discovery will reveal evidence of the misconduct complained of. *Van Dorsten v. Provident Life and Accident Ins. Co.*, 554 F.Supp.2d 285, 289 (D. Conn. 2008). Though the Supreme Court has recently advanced a more narrow reading of the pleading rules, it still adheres to the proposition that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote

and unlikely.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## II. **The Term "Foundation" Is Ambiguous.**

The homeowner's insurance policy issued by Amica clearly provides coverage for the collapse of a building or any part of a building, if that collapse is caused by an enumerated peril. First Amended Complaint, Document No. 9, ¶ 21 *citing* Exhibit A, form HO 00 03 05 11, page 7 of 24, as amended by form HO 01 06 11 13, page 1 of 4. The Roberges' complaint alleges that their basement walls have collapsed due to one (1) of two (2) enumerated perils; hidden decay or defective materials or methods used in the construction of their home. *Id.* The Roberges' suggest that there can be no reasonable doubt but that the basement walls are "part of (the) building." *Id.* The Roberges also allege that the concrete of these walls have failed to the degree that there has been a "substantial impairment to the structural integrity" of the entire building and, therefore, they have collapsed. See *Beach v. Middlesex Assurance Co.*, 205 Conn. 246, 252 (1987)(where the Supreme Court of Connecticut, in the absence of a policy definition, provided its definition of the word "collapse.") Where all or part of the building has collapsed due to an enumerated cause, coverage of the loss becomes the obligation of the insurer. Amica seeks to avoid that obligation by suggesting that the basement walls are part of the foundation. This argument ignores not only precedent of this Court, but also the accepted principles for interpretation of insurance policy terms.

The standards for construing the terms of an insurance policy in Connecticut are clear. Construction of an insurance policy involves a determination of the parties' intent as expressed by the policy language. *Conn. Ins. Guar. Ass'n v. Fontaine*, 278 Conn. 779, 784 (2006). However, when performing this analysis, the court must construe the policy terms "as laymen

would understand them and not according to the interpretation of sophisticated underwriters." *Vermont Mut. Ins. Co. v. Walukiewicz*, 290 Conn. 582, 592 (2009). In particular, "the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." *Id.* Where policy terms are unambiguous those terms are accorded their natural and ordinary meaning. *Jacaruso v. Lebski*, 118 Conn. App. 216, 233 (2009). However, where a term is susceptible to more than one reading, the term is construed against the insurance company as they drafted the policy terms. *New London County Mut. Ins. Co. v. Zachem*, 145 Conn. App. 160, 166 (2013). Ambiguous insurance policy terms are not only construed against the insurance company, they are construed in favor of coverage. *Middlesex Ins. Co. v. Mara,* 699 F.Supp.2d 439, 446-447 (D.Conn. 2010); *Beach v. Middlesex Assurance Co.*, 205 Conn. 246, 249-250 (1987).

This Honorable Court has had numerous occasions to construe the collapse provision used in the policy issued by Amica and has, on each occasion, specifically found that the term "foundation" was "reasonably susceptible to more than one meaning" and was, therefore, ambiguous. *Bacewicz v. NGM Ins. Co.*, 2010 WL 3023882, * 4 (D.Conn. 2010); *see also Karas v. Liberty Mutual Ins. Co.,* 33 F.Supp.3d 110, 115 (D.Conn. 2014); *Belz v. Peerless Ins. Co.*, 46 F.Supp.3d 157, 163-164 (D.Conn. 2014); *Gabriel v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5684063 (D.Conn. 2015); *Metsack v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5797016 (D.Conn. 2015). In *Bacewicz,* this Honorable Court denied summary judgment for the insurer by holding that "a reasonable jury could find that the basement walls of the [plaintiffs'] house did not constitute the 'foundation' of the house." *Bacewicz v. NGM Ins. Co.*, 2010 WL 3023882, * 4 (D.Conn. 2010). In *Karas, Belz, Gabriel,* and *Metsack,* this Honorable Court also denied

motions to dismiss by finding the term foundation to be ambiguous. These decisions all found that the term "foundation" could also mean the footings of a structure as a number of dictionaries define the term "foundation" as "the lowest load-bearing part of the building." *Karas v. Liberty Mutual Ins. Co.*, 33 F.Supp.3d 110, 115 (D.Conn. 2014); *Belz v. Peerless Ins. Co.*, 46 F.Supp.3d 157, 163-164 (D.Conn. 2014); *Gabriel v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5684063, * 4 (D.Conn. 2015); *Metsack v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5797016, *6 (D.Conn. 2015). Not only do the *Bacewicz, Karas, Belz, Gabriel,* and *Metsack* matters involve nearly identical policy language, they also involve identical damage caused by the very same condition present in the Roberges' home. The Roberges suggest that this Honorable Court should follow its prior construction of this policy language and find the term "foundation" ambiguous.

## III. Use of the Term "Footings" in Unrelated Policy Provisions does not Affect the Ambiguity of the Term "Foundation."

Amica attempts to slip past this Honorable Court's prior treatment of the nearly identical foundation exclusions by reference to policy language unrelated to the collapse provision which contains both the terms "foundation" and "footings." This Honorable Court has also had the occasion to construe insurance policies that contain reference to "footings" and, even in that case, has still found the term "foundation" ambiguous with respect to collapse coverage. *See Metsack v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5797016, *6 (D.Conn. 2015). In *Metsack*, this Honorable Court found that "the separate usage of 'footings' and 'foundation' elsewhere in the policy is not dispositive here, because a house may or may not have a separate 'footing' and 'foundation' depending upon its construction." *Id.* This Honorable Court found that the typical construction methods of this time called for "footings" to be a separate structural element and that a reasonable trier of fact could conclude that the "footings" of such a home could be the

"foundation." *Id.* This Court further explained that "[t]his interpretation would not render either term superfluous, because, there may be circumstances in which a house has foundational walls, supported by footings, without any basement." *Id.*

In *Metsack*, this Honorable Court also found the notion that the basement walls are part of the "building" and not the "foundation" to be further supported by the policy language concerning the method of calculating the replacement value of a covered "building." To determine the replacement cost of a "building" the policy requires that you "not include the value of: (a) [e]xcavations, footings, foundations, piers or any supports which are below the undersurface of the lowest *basement floor*…." Exhibit A, Homeowner's Policy Form HO 00 03 94, Section I – Conditions, para. D. Loss Settlement, subpara. 2.c.(1), page 15 of 24 (emphasis added). Walls under the policy are considered "foundation walls" only if there is "*no basement.*" Exhibit A, Homeowner's Policy Form HO 00 03 94, Section I – Conditions, para. D. Loss Settlement, subpara. 2.c.(2), page 15 of 24 (emphasis added).

This Honorable Court found that the provisions regarding the calculation of the replacement cost of a building suggests "two key concepts: *first*, that a foundation can exist 'below the undersurface of the lowest basement floor,' which implies that a basement wall and a foundation are not *always* one and the same, and *second*, that the policy in at least some capacity differentiates between homes constructed with and without a basement by distinguishing 'foundation walls ... if there is no basement' from 'foundations below the undersurface of the lowest basement floor.'" *Metsack v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5797016, *7 (D.Conn. 2015)(emphasis in the original). The Roberges suggest that the reasoning of the *Metsack* decision is sound and that the mere reference to the term "footings" in other portions of the

policy does not render the term "foundation" unambiguous. Rather, the Roberges suggest that, at the very most, the language by Amica quoted concerning "footings" serves only to introduce further ambiguity in the contract, which ambiguity must be construed against the insurer and in favor of coverage. *Middlesex Ins. Co. v. Mara*, 699 F.Supp.2d 439, 446-447 (D.Conn. 2010); *Beach v. Middlesex Assurance Co.*, 205 Conn. 246, 249-250 (1987).

## IV. The Roberges' Complaint Provides Fair Notice to Amica of their Claim and the Grounds Supporting that Claim.

Amica's assertion that the Roberges must plead facts conforming to the referenced "collapse" definition is a, perhaps intentional, oversimplification of the coverage questions at issue. Though the Roberges attached a copy of the policy issued by Amica for the years 2015 to 2016, this action seeks to determine whether coverage exists under any of the insurance policies issued them by Amica during the period that it covered their home.[2] *See* First Amended Complaint, Doc. 9, ¶¶ 20, 22, 24. Amica well knows, and cites the particular language in its motion, that insurance policies are issued in one year increments and that a loss is covered or not covered based upon the terms of the policy that was in effect at the time that the loss occurred. Exhibit A, Form HO 00 03 05 11, Section I – Conditions, Para. Q, p. 16 of 24[3]. As a result, a crucial component of the coverage analysis in these JJ Mottes concrete cases is a determination, to the extent possible with current scientific methods, the year in which the "collapse" occurred. This timing analysis will require the assistance of expert engineers and, perhaps, other scientists. This timing analysis is necessary to determine what policy provisions apply to the particular

[2] The Roberges attached the 2015 to 2016 iteration of the policy to their complaint simply because it was the only complete policy in their possession at the time the complaint was filed. During the initial claims process, they requested prior policies, however, they have not yet received these prior policies from Amica.

[3] Amica cites the policy period language found in Section II of the policy. The Roberges suggest that the policy period provision actually applicable to their claim is that found in Section I of the policy.

collapse loss, in order to judge whether that particular policy covers or does not cover the damage.

This timing analysis is all the more important in cases such as this, where an insurance company has attempted to avoid coverage for the JJ Mottes concrete decay claims by changing their policy language. It has been the law in Connecticut for almost 30 years that where the term "collapse" is undefined by an insurance policy a collapse occurs where there has been a "substantial impairment to the structural integrity" of a structure. *Beach v. Middlesex Assurance Co.*, 205 Conn. 246, 252 (1987). In the year 2006, Amica amended its policy language to define the term "collapse" in an effort to reduce or completely avoid its liability for the known JJ Mottes condition. *See* Ex. B, Affidavit of Catherine A. Franks.[4] Though newer Amica policies define the term "collapse," those policies issued prior to 2006 contain no definition of the term and, therefore, a collapse would occur with the substantial impairment of the structural integrity of a building. *Beach v. Middlesex Assurance Co.*, 205 Conn. 246, 252 (1987). Should the structural integrity of the basement walls of the Roberges' home have become substantially impaired prior to 2006, a covered collapse would have occurred not subject to the amended language proffered by Amica.

Amica is well aware of the impact of a pre-2006 substantial impairment. Amica has offered its amended language in past cases to avoid payment of claims involving the degradation of concrete basement walls due to the use of JJ Mottes concrete. In one of these cases, Amica was denied summary judgment due to factual issues involving the timing of the loss. Ex. C,

---

[4] This affidavit was submitted by Amica in support of a summary judgment motion in a related JJ Mottes concrete decay case. *See Francis J. Boucher, et al. v. Amica Mut. Ins. Co.*, Tolland Superior Court Docket No. TTD-CV-6004826-S. While the Roberges dispute the intent of this amendment as stated in the affidavit, it accurately portrays the timing of the policy amendment for the purposes of defining "collapse."

Denial of Summary Judgement in the case of *Boucher v. Amica Mut. Ins. Co.* By casually assuming in its arguments that the loss occurred after its amendment to the collapse provisions of its policy without so much as noting that an amendment was made, Amica has been far from forthright as to the nature and extent of the coverage analysis in these concrete decay cases. Amica's arguments also assume that even if the "substantial impairment" occurred post-2006, that it cannot be abrupt in nature and cannot impact the Roberges' ability to remain in the home. Respectfully, these assertions are based on assumptions concerning the nature of the damage and the purported clarity of the amended collapse language and may or may not be based in fact.[5]

Should the Court deem it necessary, the Roberges are happy to offer an amended pleading containing further and more specific allegations as to the progressive nature of the chemical reaction occurring in the basement walls of their home, the damage it causes, and the timing of substantial impairment. However, the Roberges suggest that the exploration of these technical issues are far better suited to discovery. As it stands now, the First Amended Complaint provides "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) *citing Conley v. Gibson*, 355 U.S. 41, 47 (1957). In particular, the Roberges have pleaded that they seek coverage for damage to their home under the "collapse" provision of one or more of the policies issued them by Amica. First Amended Complaint, Doc. 9, ¶ 20-22. The Roberges have also pleaded facts concerning the peculiar nature of the chemical reaction associated with the JJ Mottes concrete and its ultimate impact on homes affected by this condition. *Id.* at ¶10-13, 15-

[5] As of the time of this Memorandum Amica has not made a coverage decision and is, presumably, still investigating the facts and circumstances of the alleged loss. First Amended Complaint, Document No. 9, ¶ 26.

17. Respectfully, these allegations give Amica fair notice of the Roberges' coverage theory and the claims upon which these theories rest sufficient to allow productive discovery and to allow Amica to develop its potential defenses – such as the amendment to the collapse provision. Therefore, the Roberges suggest that they have satisfied their pleading burden in this matter.

## V. The Roberges have Plausibly Alleged that the Loss Occurred During Amica Coverage.

As discussed more fully above, there is no question but that the actual date of loss – the precise point in time where the structural integrity of the Roberges' home became substantially impaired – requires expert analysis. However, the Roberges' complaint provides sufficient specificity as to their theory to give Amica fair notice of their claim and the grounds upon which it rests. While Amica asserts that it has not insured the property for its whole life, the complaint alleges that the loss possibly occurred during the time that Amica insured the property and, therefore, Amica has exposure for this loss. First Amended Complaint, Document No. 9, ¶ 5-6. Further, the Roberges' allegations clearly contemplate the notion that Amica would only need to cover the loss if it occurred during the time that Amica insured the property. *Id.* at ¶ 20. However, given that the condition at work in the Roberges' home worsens over time, it is reasonable to infer that the "substantial impairment" occurred during the later twenty (20) plus years that Amica insured their home, rather than the years immediately following the home's construction. The Roberges suggest that these facts, along with the other allegations of the complaint, state a claim for coverage that is plausible on its face and sufficiently clear for Amica to respond to the Complaint and defend this action.

This Honorable Court has also had occasion to address these arguments in prior cases involving the collapse of the basement walls of a home due to the degradation of concrete

supplied by the J.J. Mottes Company. In *Karas,* this Honorable Court rejected a similar timing argument finding that because "the Karases allege that the substantial impairment took place at some point between the date on which the basement walls were poured and the date on which they discovered the impairment, which includes the period covered by the Policy, thus the Karases' factual allegation with regard to the time when the loss occurred is also enough to raise their right to relief above the speculative level." *Karas v. Liberty Mutual Ins. Co.*, 33 F.Supp.3d 110, 116 (D.Conn. 2014). This reasoning was followed in *Gabriel* which found that the homeowner's allegations that the substantial impairment occurred during a period of time that the defendant insurer was on the risk were sufficient to state a claim and survive the motion to dismiss. *Gabriel v. Liberty Mut. Fire Ins. Co.,* 2015 WL 5684063, * 4 (D.Conn. 2015). The Roberges suggest that they have also made sufficient allegations as to the time of loss to survive this instant motion to dismiss.

## CONCLUSION

For the foregoing reasons, the plaintiffs, Dennis E. Roberge and Kristi S. Roberge, respectfully request that this Honorable Court deny the defendant, Amica Mutual Insurance Company's, Motion to Dismiss.

**PLAINTIFFS,**
**DENNIS E. ROBERGE AND**
**KRISTI S. ROBERGE**

By:*/s/ Jeffrey R. Lindequist, Esq.*________
Jeffrey R. Lindequist, Esq.
One Monarch Place, Suite 2220
Springfield, MA 01144
Tel. (413) 736-4101 Fax (413) 736-4582
jlindequist@mdparkerlaw.com
Federal Bar #ct29425

## CERTIFICATE OF SERVICE

I hereby certify that on **October 21, 2015**, a copy of foregoing **Plaintiffs' Memorandum of Law in Opposition to the Defendant's Motion to Dismiss** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/*Jeffrey R. Lindequist, Esq.*