UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| DENNIS E. ROBERGE | |
| KRISTI S. ROBERGE | |
| Plaintiffs | |
| | Civil Action No. |
| VS. | 3:15-cv-01262 (WWE) |
| | |
| AMICA MUTUAL INSURANCE COMPANY | March 6, 2017 |
| Defendant | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## SECOND AMENDED COMPLAINT

NOW COME the plaintiffs, Dennis E. Roberge and Kristi S. Roberge, by their attorney, Jeffrey R. Lindequist, Esq., complaining of the defendant, Amica Mutual Insurance Company, as follows:

### PARTIES

1. The plaintiffs, Dennis E. Roberge and Kristi S. Roberge (hereinafter "the Roberges"), own and occupy the residential property located at 132 Zeya Drive, Coventry, Connecticut, 06238.

2. The defendant, Amica Mutual Insurance Company, (hereinafter "Amica"), is an insurance company incorporated under the laws of Rhode Island and having a principal place of business at One Hundred Amica Way, Lincoln, Rhode Island, 02940. At all times material to this claim, Amica was engaged in the business of writing homeowner's insurance policies and issuing such policies to citizens of various states, including the State of Connecticut.

## JURISDICTION

3. This matter is brought pursuant to the authority vested in the courts of the United States pursuant to 28 U.S.C. § 2201.

4. This Honorable Court has subject matter jurisdiction over this matter pursuant to 42 U.S.C. § 1332(a) as this action involves citizens of different states and the amount of controversy exceeds $75,000.00 exclusive of interest and costs.

## GENERAL ALLEGATIONS

5. The Roberges purchased the residential property located at 132 Zeya Drive, Coventry, Connecticut in August of 1993. The home was built in 1984.

6. The Roberges have insured their home at 132 Zeya Drive with Amica since they purchased the property.

7. The Roberges paid the premium charged by Amica each year during the coverage period and, without further action on the Roberges' part, the subject policy was automatically renewed by Amica yearly subject to the payment of the related premiums, all of which were timely and satisfactorily paid. A copy of the most recent complete Homeowner's Policy issued by Amica to the Roberges is attached hereto, and made a part hereof, and marked as Exhibit A.

## COUNT I
**(Declaratory Judgment)**

8. In the spring of 2015, the Roberges began to notice the severe degradation of what they thought to be a simple cosmetic patch of the series of horizontal and vertical cracks throughout most of the basement walls of their home.

9. In response to noticing this degradation, the Roberges undertook an investigation of this condition, its cause, and the method of repair by consulting with contractors and engineers in the late spring and early summer of 2015.

10. Upon further inquiry into the cause of the deterioration and the potential methods of repair, the Roberges discovered that the form of "pattern cracking" found in the basement walls of their home was due to a chemical compound found in certain basement walls constructed in the late 1980s and the early 1990s with concrete most likely from the J.J. Mottes Concrete Company.

11. The aggregate used by J.J. Mottes Concrete Company in manufacturing the concrete in that particular time period contained a chemical compound which, with its mixture with water, sand, and cement necessary to form the concrete, began to oxidize (rust) and expand, breaking the bonds of the concrete internally and reducing it to rubble.

12. There is no known scientific or engineering method or process which is effective in reversing the deterioration, it continues to advance with or without the presence of visible water.

13. At some point between the date on which the basement walls were poured and the spring of 2015, the basement walls suffered a substantial impairment to their structural integrity.

14. The Roberges took steps to remove and replace their basement walls, however, but for the replacement of those walls it was only a question of time until the basement walls of the Roberges' home would fall in due to the exterior pressure from the surrounding soil.

15. With the falling in of the basement walls, the entire home would have fallen into the basement.

16. The Roberges first learned of the existence of this substantial impairment in the spring of 2015, when an engineer informed them that the cracking could not be repaired and that the basement walls would need to be removed and replaced.

17. The Roberges notified Amica of their damage on July 15, 2015.

18. Thereby, the Roberges made a timely claim for coverage of the loss in accordance with the terms of one or more of the Homeowners Policies issued by Amica during the years that it covered the Roberges' property.

19. Pursuant to the terms of the Homeowners Policy, Section I, Additional Coverages, ¶ 8, as amended by the Special Provisions – Connecticut endorsement, Amica agreed to provide coverage for "direct physical loss to covered property involving abrupt collapse of a building or any part of a building caused only by one or more of the following:…(b) Decay, of a building or any part of a building, that is hidden from view;… or (f) Use of defective material or methods in construction, remodeling or renovation."  Exhibit A, form HO 00 03 05 11 page 7 of 24, as amended by form HO 01 06 01 13, page 1 of 4.

20. While the Roberges have only the most recent iteration of the Homeowner's Policy issued to them by Amica, upon information and belief all prior insurance policies contain some measure of coverage for the collapse of a building or part of a building.

21. Prior to removal and replacement, the original basement walls of the Roberges' home were in a state of collapse, which collapse was the result of a covered cause.

22. The damage suffered to the basement walls of their home is a covered loss under the terms of one or more of the Homeowners Policies issued by Amica during the years that it covered the Roberges' property.

23. After investigating the Roberges' claim for more than a year and a half, Amica denied coverage by way of letter dated February 15, 2017.

24. The grounds offered by Amica for the denial of coverage are contrary to the express provisions of the homeowner's policies issued to the Roberges.

25. There is an actual controversy with respect to the coverage afforded by one or more of the Homeowner's Policies issued by Amica to the Roberges during the years it covered the property.

## COUNT II
### (Breach of Contract)

26. The plaintiffs realleged in this Count II the allegations set forth in paragraphs 1 through 25 above as it the same were herein separately set forth.

27. In denying coverage for the Roberges' claim, Amica breached its contractual obligations under the homeowner's policies issued to the Roberges, all to the financial loss and damage to the Roberges.

28. The total cost, to date, of removing and replacing the original concrete basement walls of the Roberges' home, along with the related work to restore those areas disturbed by the removal and replacement operation, was approximately $174,000.00.

## COUNT III

29. The plaintiffs realleged in this Count III the allegations set forth in paragraphs 1 through 28 above and paragraphs 39 through 46 below as if the same were herein separately set forth.

30. The Roberges submitted their claim for coverage to Amica on or about July 15, 2015.

31. Amica denied coverage by citing to policy exclusions that are wholly inapplicable to the damage suffered to the basement walls of the Roberges' home.

32. Upon information and belief, Amica intentionally cited policy exclusions wholly inapplicable to the Roberges' claim for coverage knowing full well that the Roberges, like most

insureds, are unsophisticated with respect to the complex language contained in insurance policies.

33. Upon information and belief, Amica acted intentionally to mislead the Roberges and convince them that the damage suffered to their home was not covered solely to preserve its own assets by avoiding payment of a covered loss.

34. By denying coverage in this manner, Amica has impeded the Roberges' right to receive benefits that they reasonably expected to receive under the contracts for homeowner's insurance.

35. Amica has acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of its duties by denying the Roberges' claim for coverage under one or more of the homeowner's insurance policies it issued to them.

36. Upon information and belief, and based in part upon those facts alleged in paragraphs 41 through 48 below, Amica has a general business practice of acting intentionally to mislead its insureds into believing that the collapse of the basement walls of a building caused by hidden decay or by the use of faulty or defective materials or methods of construction is not a covered loss.

37. As a direct result of the Amica's bad faith, the Roberges have suffered loss and damages including loss of monies due them pursuant to the contracts of insurance, as already set forth herein, as well as related court costs and attorney's fees to bring suit to litigate their claim, along with the loss of interest on liquidated funds due them under said policy of insurance.

## COUNT IV
### (Unfair and Deceptive Practices in Violation of the Connecticut Unfair Insurance Practices Act and the Connecticut Unfair Trade Practices Act)

38. The plaintiffs reallege in this Count IV the allegations set forth in paragraphs 1 through 37 above as if the same were herein separately set forth.

39. Amica is an insurance company licensed and qualified to engage in the business of insurance within the State of Connecticut.

40. Amica, upon information and belief, participates in the Insurance Services Office, Inc., ("ISO") which is a cooperative organization formed and controlled by its participants for the purpose, among others, of collecting data on the type of claims made, the policy provisions cited for the basis of each claim, the geographic areas in which the claimed damage has occurred, and the actions taken by insurers in response to such claims.

41. The ISO is also instrumental in drafting policy provisions and it prepares interpretations or advice as to the meaning of these provisions.

42. Amica has not informed its policy holders, including the Roberges, of its participation in or of the operations of the ISO.

43. Through the ISO, Amica has knowledge of the number of claims in northeastern Connecticut that have arisen due to the form of hidden decay in the concrete of the basement walls of residential structures similar to the Roberges' home. For the purpose of identification, such claims are referred to as "concrete decay" claims.

44. Through the ISO, Amica has knowledge that most, if not all, insurers responding to concrete decay claims in residential structures in northeastern Connecticut have attempted to

deny coverage on the grounds that the condition is the result of one or more excluded causes, such as:

      i.      ordinary wear and tear;

      ii.     water beneath the surface of the ground;

      iii.    earth movement and/or settling;

      iv.    homeowner negligence in failing to waterproof the exterior of the concrete; or

      v.     on the grounds that the claim was not presented in a timely manner.

45.    Through the ISO, Amica has knowledge of cases such as *Bacewicz v. NGM Insurance*, Connecticut Federal District Court Civil Action No. 3:08-CV-01530 (JCH), where the plaintiffs were awarded judgment against the insurer on a concrete decay claim based on policy language nearly identical to that in the Roberges' policies.

46.    Notwithstanding Amica's knowledge of the specific policy provision offering coverage for the collapse of a building or any part of a building and the definition of the word "collapse" as it is used in such collapse provisions, Amica gave the insured a knowingly false and misleading reason for the denial of coverage.

47.    By Amica's denial of coverage on February 25, 2017 on untenable grounds, it has become a part of or confirmed its participation in an insurance industry wide practice of denying coverage for concrete decay claims, notwithstanding the clear provisions of one or more of the homeowner's insurance policies it issued to the Roberges to the contrary.

48.    Amica, based on the facts alleged in Counts I, II, and III above, has failed to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; as it has arbitrarily refused to pay a claim which a

reasonable person would determine is covered by one or more of the series of homeowners insurance policies issued to the Roberges.

49.  Amica, based in part on the facts alleged in paragraphs 40 through and including 47 above, has regularly been engaged, as part of its general business practice, in refusing to attempt in good faith to effectuate prompt, fair and equitable settlements of concrete decay claims in which liability has become reasonably clear.

50.  Amica's participation in the insurance industry wide practice of denying coverage for concrete decay claims as part of its general business practice is further confirmed by its refusal to provide coverage in at least one (1) other instance involving other homeowners experiencing the same damage caused by the same mechanism and involving policy language identical to that in the Roberges' policies. *See Francis J. Boucher, Jr., et al. v. Amica Mut. Ins. Co.*, Tolland Superior Court Docket No. TTD-CV-12-6004826-S.

51.  By failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear as part of its general business practice, Amica has engaged in conduct proscribed by the Connecticut Unfair Insurance Practices Act. *Conn. Gen. Stat.* § 38a-816(6)(F).

52.  By engaging in this conduct prohibited by the Connecticut Unfair Insurance Practices Act, Amica has also violated the Connecticut Unfair Trade Practices Act. *Conn. Gen. Stat.* § 42-110a, *et seq.*

53.  As a direct cause of Amica's unfair and deceptive trade practices, the Roberges have suffered loss and damages including loss of moneys owed pursuant to the contract of insurance, as already set forth herein, as well as related court costs and attorney's fees to bring

suit to litigate their claim, along with the loss of interest on funds due them under said policy or policies of insurance.

**WHEREFORE**, the plaintiffs, Dennis E. Roberge and Kristi S. Roberge, claim the following relief against the defendant, Amica Mutual Insurance Company, on each count:

1. A declaration that the defendant, Amica Mutual Insurance Company has a duty to provide coverage for the damage suffered to their home, pursuant to the authority granted by 28 U.S.C. § 2201;

2. Any further relief that the Court deems necessary and proper, pursuant to 28 U.S.C. § 2202.

3. Just fair and reasonable money damages against the defendant;

4. Pre judgment and post judgment interest pursuant to *Conn. Gen. Stat* § 37-3a and any other applicable statutes;

5. Attorney's fees and costs pursuant to *Conn. Gen. Stat*. §42-110g and any other applicable statute;

6. Punitive damages pursuant to *Conn. Gen. Stat*. §42-110g;

7. Such other and further relief as the court deems just and equitable.

**The Plaintiffs Demand a Trial by Jury on All Counts So Triable.**

**PLAINTIFFS,
DENNIS E. ROBERGE and
KRISTI S. ROBERGE**

By: */s/ Jeffrey R. Lindequist, Esq.*
　　Jeffrey R. Lindequist, Esq.
　　Law Office of Michael D. Parker, Esq.
　　One Monarch Place, Suite 2220
　　Springfield, MA 01144
　　(413) 736-4101 – *Telephone*
　　(413) 736-4582 – *Facsimile*
　　jlindequist@mdparkerlaw.com
　　Federal Bar #ct29425