UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

DENNIS E. ROBERGE                    )
KRISTI ROBERGE,                      )
    Plaintiffs                   )
                              )         CIVIL ACTION NO. 3:15-CV-01262-WWE
v.                                   )
                              )
AMICA MUTUAL INS. CO.                 )
    Defendant.                   )

## DEFENDANT, AMICA MUTUAL INSURANCE COMPANY'S, MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, Amica Mutual Insurance Company ("Amica") respectfully submits this Memorandum of Law in support of its Motion for Summary Judgment as to all counts in the Plaintiffs' Second Amended Complaint and Defendant's Counterclaim pursuant to Fed. R. Civ. P. 56. Judgment should enter for Amica on all claims because:

I.    There is no coverage for "collapse" to a "foundation" under any insurance Policy Defendant ever issued to Plaintiffs. Any "reasonable interpretation" of "foundation" must include the property's basement walls. Accordingly, Plaintiffs' claim for "collapse" of their foundation/basement walls fails as a matter of law.

    a.   The Policies' language requires that (1) "foundations" exist above the "basement floor," and (2) "foundations" have "walls." Accordingly, Plaintiffs' argument that "foundation" is ambiguous and could refer to "footings" fails because "footings" do not exist *above* the "basement floor" and do not have "walls."

    b.   The Polices operative after July 26, 2006, provide even further support for this conclusion as they specifically, and repeatedly, delineate between the terms "footing" and "foundation."

    c.   Plaintiffs have not claimed damages for an "ensuing loss."

II.   Alternatively, judgment should enter in Amica's favor because (1) Plaintiffs' claimed loss does not meet the definition of "collapse" under the post-July 26, 2006 Policies, and (2) Plaintiffs cannot produce any evidence to demonstrate that a "substantial impairment to the structural integrity" of their basement walls

1172550.1

existed prior to July 26, 2006, thereby defeating their claim for coverage under the pre-July 26, 2006 Policies.

    a. Connecticut state and Federal courts have repeatedly held that Plaintiffs' claims fail as a matter of law under the Amica Policies that were operative on or after July 26, 2006 because (1) the claimed damage was not "abrupt," and (2) Plaintiffs cannot demonstrate that "the [home] or any part of the [home] cannot be occupied for its intended purpose," as a result of the claimed damage. England v. Amica Mut. Ins. Co., 2017 WL 3996394 (D. Conn. Sept. 11, 2017); Celentano v. Amica Mut. Ins. Co., No. 3:17-00359 (JAM); Mazzarella v. Amica Mut. Ins. Co., No. 3:17-00598(SRU); See Miller v. Allstate Ins. Co., 2017 WL 37632425 (D. Conn. Aug. 29, 2017); Clough v. Allstate Ins. Co., 2017 WL 3763841 (D. Conn. Aug. 29, 2017); Adams v. Allstate Ins. Co., 2017 WL 3763837 (D. Conn. Aug. 29, 2017); Agosti v. Merrimack Mut. Fire Ins. Co., 2017 WL 3710786 (D. Conn. Aug. 28, 2017); Metsack v. Liberty Mut. Fire Ins. Co., 2017 WL 706599 (D. Conn. Feb. 21, 2017); Alexander v. General Ins. Co. of America, No. 3:16-00059 (SRU) at entry 26; Toomey v. Central Mut. Ins. Co. et al., (Conn. Super. Aug. 3, 2017); Jemiola v. Hartford Ins. Co., 2017 WL 1258778 (Conn. Super. March 2, 2017);

    b. There is no coverage under any pre-July 26, 2006, Policy because Plaintiffs cannot produce any evidence to demonstrate that there was a "substantial impairment to the structural integrity" of the basement walls prior to July 26, 2006. Jemiola, supra.

III.  Judgment should enter for Amica on Count III of Plaintiffs' Complaint Because Plaintiffs cannot establish a genuine issue of material fact that supports a violation of the implied covenant of good faith and fair dealing.

    a. Because Plaintiffs' contractual claims fail as a matter of law, any bad faith claim is futile as a matter of law.

    b. Alternatively, Plaintiffs cannot demonstrate that Amica breached any implied covenants and accordingly Count III fails.

IV.  Judgment should enter on Count IV of Plaintiffs' Complaint because Plaintiffs cannot establish a genuine issue of material fact that supports CUTPA and/or CUIPA liability.

    a. Because Plaintiffs' contractual claims fail as a matter of law, their CUTPA/CUIPA claim is futile as a matter of law.

    b. Alternatively, Plaintiffs cannot show that Amica violated CUTPA and/or CUIPA and Amica is entitled to judgment on Count IV.

1172550.1

## BACKGROUND

This is an action for Declaratory Judgment (Count I), Breach of Contract (Count II), Violation of the Implied Covenant of Good Faith and Fair Dealing (Count III), and Unfair and Deceptive practices in violation of the Connecticut Unfair Insurance Practices Act (CUIPA) and the Connecticut Unfair Trade Practices Act (CUTPA) (Count IV). The operative Complaint is the Plaintiffs' Second Amended Complaint (hereinafter the "Complaint") that was filed on March 7, 2017. Ex. 2.[1] Plaintiffs claim that Defendant incorrectly denied their claim for insurance coverage under insurance policies issued by Defendant to Plaintiffs for alleged damage to the concrete basement walls of their home.

### I.    FACTUAL BACKGROUND.

Dennis and Kristi Roberge ("Plaintiffs") own the residential property located at 132 Zeya Drive, Coventry Connecticut, 06238 (the "Property"). SOF[2] ¶26. The Property was built in 1984 and Plaintiffs purchased the property in 1993. SOF ¶27. Plaintiffs have insured the Property with Amica since they purchased it. SOF ¶28.

Plaintiffs first discovered cracking in the concrete basement walls of their home in late 2008 or early 2009. SOF ¶29. Plaintiffs retained a company called Attack A Crack to patch the cracks in their basement walls in 2009. SOF ¶30. Plaintiffs did not contact

---

[1]    Citations to exhibits refer to the exhibits submitted with Defendant's  Local Rule 56(a)1 "Statement of Undisputed Material Facts" which Defendant also filed with the Court today

[2]    "SOF" refers to the Local Rule 56(a)1 "Statement of Undisputed Material Facts" which Defendant also filed with the Court today. Reference to specific paragraphs incorporates the exhibits cited therein.

Amica and never made an insurance claim with Amica regarding the cracks that they noticed in the basement walls in 2009. SOF ¶31.

In 2013 Plaintiffs contacted Luc Richard of Attack A Crack again because, as Mr. Roberge stated, "there were cracks reappearing in the <u>foundation</u>." SOF ¶32 (underscoring supplied). Mr. Richards recommended that Plaintiffs contact Dean Soucy, a general contractor to discuss further repairs to the proeprty. SOF ¶33. Plaintiffs allege that Mr. Soucy first inspected the Property on August 27, 2013. SOF ¶34. Plaintiffs did not contact Amica and never made an insurance claim with Amica regarding the "cracks reappearing in the foundation" that they noticed in the basement walls in 2013. SOF ¶35.

Plaintiffs have occupied the home at all times since they purchased the home in 1993. SOF ¶36. No one has ever advised Plaintiffs that they should leave the home. SOF ¶37. Plaintiffs' use of the home has not been limited in any way. SOF ¶38.  The Property, including the basement and garage, has been occupied by Plaintiffs from 2009 to the present in the same manner it was occupied prior to Plaintiffs' discovery of the cracks to their foundation/basement walls in or around 2008 or 2009. SOF ¶39. The condition of the basement walls did not affect anything with respect to the Plaintiffs' ability to use their home on a day-to-day basis. SOF ¶40.

On July 15, 2015 Plaintiffs notified Amica of alleged damage to the concrete basement walls of their home. SOF ¶41. Amica issued a reservation of rights letter to the insureds two days later on July 17, 2015, and inspected the loss SOF ¶42. Amica's investigation included (1) an inspection of the Property by Dallas Dodge, an

4

independent adjuster from A.E. Oberhaus, and Carl Cianci of Cianci Engineering, LLC on July 23, 2015, (2) an inspection of the property by Ulrich LaFosse, P.E. of GeoDesign Inc. on December 2, 2015, and (3) on-site core sampling and boring of the Property by GeoDesign, Inc. on March 11, 2016. SOF ¶43. Mr. Cianci issued a report dated December 15, 2016. SOF ¶44. Mr. LaFosse issued a report dated April 29, 2016. SOF ¶45. Mr. Cianci also prepared a memorandum dated August 16, 2016. SOF ¶46. Copies of these reports and memorandum were provided to Plaintiffs. SOF ¶47. Amica then retained outside counsel to render a legal opinion concerning whether coverage existed under the Roberges' Amica insurance policies for the claimed loss. SOF ¶48. Attorney Newbury concluded "that the claim by The Roberges is not covered and should be denied." SOF ¶49.

On February 15, 2017, Amica rendered its coverage decision, informing the Plaintiffs that "[u]nfortunately, despite [Amica's] extensive investigation and thorough analysis, we cannot find coverage for the Roberges' claim under the Policy or under any other policy that may apply." SOF ¶50.

Following receipt of this February 15, 2017, correspondence, Plaintiffs filed their Second Amended Complaint which alleged that "[a]t some point between the date on which the basement walls were poured and the spring of 2015, the basement walls suffered a substantial impairment to their structural integrity." SOF ¶51. Plaintiffs make this allegation in an attempt to claim entitled to coverage under the Amica policies that were operative prior to July 26, 2006 based on the Connecticut Supreme Court's holding in Beach v. Middlesex Mutual Assurance Co., 205 Conn. 246, 252 (1987)(holding that

for policies which include the "collapse" language in the pre-July 26, 2006 Policies, collapse is defined as "substantial impairment in the structural integrity of a building"). However, throughout the course of discovery, Plaintiffs have produced no evidence from which a finder of fact could conclude when this "substantial impairment to structural integrity" occurred prior to July 26, 2006. SOF ¶52.  In fact, Plaintiffs' own expert, David Grandpre, testified at his deposition as follows:

> Q: [A]re you able to identify a specific date as far as when the Roberge's foundation became substantially impaired?
>
> A: No.
>
> Q: Are you sitting here today able to give an approximate range of when, in your opinion, the foundation became substantially impaired?
>
> A. No.

SOF ¶53.

## II.    RELEVANT INSURANCE POLICY LANGUAGE.

Over the period of time that Amica insured Plaintiffs' home the relevant Policies' language changed. Accordingly, Amica sets forth the relevant language for each time period below.

### a.  Policy language from July 26, 2012 to July 26, 2016.

The Policies operative between July 26, 2012, and July 26, 2016 all contained the following relevant language:

**AGREEMENT**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.
…

6

**SECTION I – PROPERTY COVERAGES**

**A.   Coverage A – Dwelling**

1.   We cover:

a.   The dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling;

…

**E.   Additional Coverages**

…

8.   **Collapse** [as amended by Endorsements HO 01 06 01 13 and HO 01 06 12 11]

a.   This Additional Coverage does not:

(1) Increase the limit of liability that applies to the damaged covered property; nor

(2) Reduce or eliminate coverage with respect to loss that was caused by a Peril Insured Against named under Coverage **C**.

b.   The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse.

c.   For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

d.   This Additional Coverage – Collapse does not apply to:

(1)   A building or any part of a building that is in danger of falling down or caving in;

(2)   A part of a building that is standing, even if it has separated from another part of the building; or

(3)   A building or any part of a building that is standing, even if it shows evidence of cracking, bulging,

7

sagging, bending, leaning, settling, shrinkage or expansion.

**e.**   We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one of more of the following:

**(1)**   The Perils Insured Against;

**(2)**   Decay, of a building or any part of a building, that is hidden from view, unless the presence of such decay is known to an **insured** prior to collapse;

**(3)**   Insect or vermin damage, to a building or any part of a building, that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**(4)**   Weight of contents, equipment, animals or people;

**(5)**   Weight of rain which collects on a roof; or

**(6)**   Use of defective materials or methods in construction, remodeling or renovation.

**f.**   Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under **e.(2)** through **(6)** above, unless the loss is a direct result of the collapse of a building or any part of a building.

## SECTION I — PERILS INSURED AGAINST

## A.   Coverage A — Dwelling And Coverage B — Other Structures

…

**2.**   We do not insure for loss:

…

**c.**   Caused by:

…

**(2)**   Freezing, thawing, pressure or weight of water or ice,

whether driven by wind or not, to a:

...

    **(b)**   Footing, foundation...

...

  **(6)**  Any of the following

...

    **(f)**   Settling, shrinking, bulging or expansion, including resultant cracking, of... footings, foundations..

## SECTION I – CONDITIONS

...

**D.**   **Loss Settlement**

...

  **c.**  To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

    **(1)**  Excavations, footings, foundations, piers, or any other structures or devices that support all or part of the building, which are below the undersurface of the lowest basement floor;

    **(2)**  Those supports described in **(1)** above which are below the surface of the ground inside the foundation walls, if there is no basement.

SOF ¶54.

In summary, under the policies issued to Plaintiffs by Amica that were operative between July 26, 2012 and July 26, 2016, in order for an insured to be entitled to coverage for collapse, they must demonstrate that there has been an "abrupt falling down or caving in with the result that the building or part of the building cannot be occupied for its current intended purpose." These Policies also make clear that a "foundation" exists above the "lowest basement floor," that a "foundation" has "walls," and repeatedly distinguish between the terms "foundation" and "footing."

**b. Relevant Policy language from July 26, 2006 to July 26, 2012.**

The Policies operative between July 26, 2006 and July 26, 2012 all contain the following relevant language:

**AGREEMENT**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.
...

**SECTION I – PROPERTY COVERAGES**

**A.      Coverage A – Dwelling**

    1.      We cover:

        **a.**      The dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling;

    ...

**E.      Additional Coverages**
    ...

    **8.      Collapse** [as amended by Endorsements HO 01 06 09 10 and HO 01 06 01 05]

        **a.**      This Additional Coverage does not:

            **(1)** Increase the limit of liability that applies to the damaged covered property; nor

            **(2)** Reduce or eliminate coverage with respect to loss that was caused by a Peril Insured Against named under Coverage **C**.

        **b.**      With respect to this Additional Coverage:

            **(1)** Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

**(2)** A building or any part of a building that is in danger of falling down or caving in is not considered t be in a state of collapse.

**(3)** A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

**(4)** A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**c.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one of more of the following:

**(1)** The Perils Insured Against;

**(2)** Decay, of a building or any part of a building, that is hidden from view, unless the presence of such decay is known to an **insured** prior to collapse;

**(3)** Insect or vermin damage, to a building or any part of a building, that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**(4)** Weight of contents, equipment, animals or people;

**(5)** Weight of rain which collects on a roof; or

**(6)** Use of defective materials or methods in construction, remodeling or renovation.

**d.** Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under **c.(2)** through **(6)** above, unless the loss is a direct result of the collapse of a building or any part of a building.

**SECTION I – PERILS INSURED AGAINST**

**A.      Coverage A – Dwelling And Coverage B – Other Structures**

...

**2.**      We do not insure for loss:

...

          **c.**      Caused by:

...

                **(2)**      Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

...

                        **(b)**      Footing, foundation...

...

                **(6)**      Any of the following

...

                        **(f)**      Settling, shrinking, bulging or expansion, including resultant cracking, of... footings, foundations..

**SECTION I – CONDITIONS**

...

**C.      Loss Settlement**

...

          **d.**      To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

              **(3)**      Excavations, footings, foundations, piers, or any other structures or devices that support all or part of the building, which are below the undersurface of the lowest basement floor;

              **(4)**      Those supports described in **(1)** above which are below the surface of the ground inside the foundation walls, if there is no basement.

SOF ¶55.

In summary, the policies issued to Plaintiffs by Amica that were operative between July 26, 2006 and July 26, 2012, also require that for an insured to be entitled

to coverage for collapse, they must demonstrate that there has been an "abrupt falling down or caving in with the result that the building or part of the building cannot be occupied for its current intended purpose." These Policies also make clear that a "foundation" exists above the "lowest basement floor," that a "foundation" has "walls," and repeatedly distinguish between the terms "foundation" and "footing."

### c.  Relevant Policy language prior to July 26, 2006.

The policies issued by Amica prior to July 26, 2006 included the following relevant language:

**SECTION I – PROPERTY COVERAGES**
...

**ADDITIONAL COVERAGES**
...

**8. Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:
...

> b.  Hidden decay;

...

> f.  Use of defective material or methods in construction, remodeling or renovation. [as amended by Endorsement HO 01 06 01 02].

Loss to a[]... foundation [or] retaining wall... is not included under items **b.** [...] and **f.** unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging, or expansion.
...

**SECTION I – PERILS INSURED AGAINST**

**COVERAGE A – DWELLING and**

13

**COVERAGE B – OTHER STRUCTURES**

We insure against risks of direct physical loss to property described in Coverages A and B.  We do not insure, however, for loss:

**1.** Involving collapse, other than as provided in Additional Coverage 8.;

**2.** Caused by:

    …

    **e.** Any of the following:

        (1)   Wear and tear, marring, deterioration;

        (2)   Inherent vice, latent defect, mechanical breakdown;

        (3)   Smog, rust or other corrosion, mold, wet or dry rot;

        …

        (6)   Settling, shrinking, bulging or expansion, including resultant cracking of pavements, patios, foundations, walls, floors, roofs or ceilings;

**SECTION I – CONDITIONS**

…

**3.**    **Loss Settlement**

…

    **(3)**   To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

        **(a)**   Excavations, foundations, piers, or supports which are below the undersurface of the lowest basement floor;

        **(b)**   Those supports described in **(a)** above which are below the surface of the ground inside the foundation walls, if there is no basement.

SOF ¶56.

In summary, the policies issued to Plaintiffs by Amica that were operative prior to July 26, 2006 make clear that a "foundation" exists above the "lowest basement floor," that a "foundation" has "walls."

14

## CONNECTICUT RULES OF INSURANCE CONTRACT INTERPRETATION

In construing an insurance policy, the Court must give its words "their natural and ordinary meaning," often by "look[ing] to the dictionary definition of the term." Lexington Ins. Co. v. Lexington Healthcare Grp., 311 Conn. 29, 42 n.8 (2014). When the contract's terms "are, without violence, susceptible of two *equally reasonable interpretations*," however, "that which will sustain the claim and cover the loss must, in preference, be adopted." Conn. Ins. Guar. Ass'n v. Drown, 314 Conn. 161, 188 (2014) (internal brackets omitted)(italics added). The Court must construe ambiguous language "in accordance with the reasonable expectations of the insured when he [or she] entered into the contract." Drown, 314 Conn. at 188. However, "courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." Plainville v. Travelers Indemnity Co., 178 Conn. 664, 675, 425 A.2d 131 (1979). "[W]hether an insurance policy is ambiguous is a matter of law for the court to decide." Travelers Cas. & Sur. Co. v. Neth. Ins. Co., 312 Conn. 714, 740 (2014). The mere fact that the parties "advance different interpretations" of phrases in a policy "does not necessitate a conclusion that the language is ambiguous." Drown, 314 Conn. at 188. But where each party "has a *reasonable* but different interpretation of the phrases supported by dictionaries and case law," that indicates that "the phrases are ambiguous" and "must be construed against the insurer." Karas v. Liberty Ins. Corp., 33 F.Supp.3d 110, 115 (D. Conn. 2014)(italics supplied).

1172550.1

Additionally, "[a] policy is to be taken as a whole and all its relevant provisions considered in connection with each other ... Every provision is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it.") Downs v. National Casualty Co., 146 Conn. 490, 495, 152 A.2d 316 (1959) (citations omitted); A.M. Larson Co. v. Lawlor Ins. Agency, 153 Conn. 618, 622, 220 A.2d 32, 34 (Conn.1966) (same).

## **ARGUMENT**

**I. THERE IS NO COVERAGE FOR "COLLAPSE" TO A "FOUNDATION" UNDER ANY INSURANCE POLICY DEFENDANT ISSUED TO PLAINTIFFS. ANY "REASONABLE INTERPRETATION" OF "FOUNDATION" MUST INCLUDE THE PROPERTY'S BASEMENT WALLS. ACCORDINGLY PLAINTIFFS' CLAIM FOR "COLLAPSE" OF THEIR FOUNDATION/BASEMENT WALLS FAILS AS A MATTER OF LAW.**

No insurance policy issued to Plaintiffs by Defendant provides coverage for a "collapse" to a "foundation." Ex. 3 at AM000127; Ex. 4 at AM000201-AM000202; Ex. 5 at AM000269-AM000270; Ex. 6 at AM000336; Ex. 7 at AM000400; Ex. 8 at AM000475; Ex. 9 at AM000549; Ex. 10 at AM000627; Ex. 11 at AM000699; Ex. 12 at AM000773; Ex. 13 at AM000810; Ex. 14 at AM000857; Ex. 15 at AM000907 ("Loss to a[] foundation is not included under [sections granting coverage for collapse], unless the loss is a direct result of the collapse of a building or any part of a building."). As outlined below, the Policies' language requires the conclusion that the term "foundation" includes the Plaintiffs' basement walls. Here, Plaintiffs seek coverage for this exact type of excluded loss and accordingly their claim fails as a matter of law. Ex. 2 at ¶21 (Plaintiffs alleging that the "basement walls… were in a state of collapse… .").

16

At the outset, Amica acknowledges that, although the issue has not been ruled on by any appellate court with binding authority, the United States District Court for the District of Connecticut has previously held that the term "foundation" is ambiguous and concluded that "foundation" could refer to a property's "footings."[3] However, Defendant notes that in *this* case the Court, in denying Amica's Motion to Dismiss the Plaintiffs' Original Complaint, stated that Amica "may have a strong argument in its favor" on this issue and noted that the issue "may be considered on a motion for summary judgment." In addition to the "strong" arguments raised at the dismissal stage, Amica now raises additional arguments, not addressed in any prior decision of this Court, which supports the conclusion that the term "foundation" in the Policies necessarily includes the Property's "basement walls."

"Foundation" is defined as "a usually stone or concrete structure that supports a building from underneath" and "an underlying base or support; *especially* **:** the whole masonry substructure of a building." <u>See</u> *Merriam-Webster.com*. Merriam-Webster, n.d. Web. 9 Sept. 2017, www.merriamwebster.com/dictionary/foundation. Therefore, the term "foundation" includes a home's "basement walls."[4] Plaintiff's claim for "collapse" of

---

[3]   <u>See e.g.</u> <u>Roberts v. Liberty Mut. Fire Ins. Co.</u>, 2017 WL 3710062 (D. Conn. Aug. 28, 2017); <u>Gabriel v. Liberty Mutual</u>, 2015 WL 5684063, *4 (D. Conn. Sept. 28, 2015); <u>Belz v. Peerless Ins. Co.</u>, 2014 WL 4364914, *3 (D. Conn. Sept. 2, 2014); <u>Karas v. Liberty Mutual Ins. Co.</u>, 2014 WL 3579524, *3 (D. Conn. July 21, 2014); <u>Bacewicz v. NGM Ins. Co.</u>, 2010 WL 3023882, *4 (D. Conn. Aug. 2, 2010);

[4]   It is noteworthy that the Plaintiff and Plaintiffs' own expert referred to the basement walls as a "foundation" in their deposition testimony. <u>See</u> <u>Ex. 17</u> at pg. 76:20-21 (Mr. Grandpre testifying that "concrete basement walls are also commonly referred to as part of the foundations"); <u>Ex. 18</u> at pg. 66:17-18 (Mr. Roberge referring to cracks in the basement wall as "cracks reappearing in the foundation.")

the "basement walls" is therefore a claim for "collapse" of the Property's "foundation," which is explicitly excluded under every Policy issued to Plaintiffs by Defendant. Accordingly, Judgment should enter for Amica on Counts I and II of Plaintiffs' Second Amended Complaint.

> **a. The Policies' language requires that (1) "foundations" exist above the "basement floor," and (2) "foundations" have "walls." Accordingly, Plaintiffs' argument that "foundation" is ambiguous and could refer to "footings" fails because "footings" do not exist *above* the "basement floor" and do not have "walls."**

Every Amica policy issued to Plaintiffs makes the following two things clear: (1) "foundations" exist *above* the "lowest basement floor" and (2) "foundations" have "walls." In light of this, Plaintiffs' argument that the term "foundation" could refer to the "lowest load-bearing part of the building," see Plaintiffs' Opposition to Amica's Motion to Dismiss at pg. 7, is unreasonable because the lowest load-bearing part of the building cannot exist *above* the "basement floor." Likewise, Plaintiffs' argument that "foundation" could refer to "footings" is unreasonable because "footings" do not have "walls" and are also not *above* the "basement floor." The only "reasonable interpretation" of the term "foundation," when the "policy is… taken as a whole and all its relevant provisions considered in connection with each other," is that the term "foundation" includes the property's "basement walls." Downs, 146 Conn.495;

Turning to the Policies' language, the "coinsurance valuation" clauses of the Policies all state either:

> **c.** To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

**(1)**   Excavations, _footings, foundations_, piers, or any other structures or devices that support all or part of the building, _which are below the undersurface of the lowest basement floor_;

**(2)**   Those supports described in **(1)** above which are below the surface of the ground inside the _foundation walls_, if there is no basement.

or:

**(3)**   To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

**(a)**   Excavations, _foundations_, piers, or any supports which are _below the undersurface of the lowest basement floor_;

**(b)**   Those supports described in **(a)** above which are below the surface of the ground inside the _foundation walls_, if there is no basement

SOF ¶¶ 54, 55, 56.

The Policies' references to "foundation walls" means that a foundation _must_ be able to have a wall. A footing does not have a wall. The only reasonable interpretation of the term "foundation" which accounts for the Policies' use of the phrase "foundation walls," is that "foundation" refers to the to "the whole masonry substructure of a building," including the concrete walls which extend from first floor of the home to the ground, whether the home has a basement or not. See Merriam-Webster, supra.

Furthermore, the Policies' use of the phrase "below the undersurface of the lowest basement floor" requires the conclusion that foundations can exist _above_ the lowest basement floor. This is true regardless of whether the phrase "below the undersurface of the lowest basement floor" modifies the term "foundation" or not.

19

As noted in Amica's Reply Memorandum in support of its Motion to Dismiss, "the last antecedent rule of contractual and statutory construction…provides that 'qualifying phrases, absent a contrary intention, refer solely to the last antecedent in a sentence'." Connecticut Ins. Guar. Ass'n v. Drown, 314 Conn. 161, 189, 101 A. 3d 200 (2014). Under the "last antecedent rule" the phrase "below the undersurface of the lowest basement floor" in the Policies would only modify the phrase "any other structures or devices that support all or part of the building," but would not modify the term "foundation." Accordingly, if the "last antecedent rule" applies to the policy, foundations are *not* "support[s]," "structure[s]," or "device[s]"  "below the undersurface of the basement floor." Under this construction, the only "reasonable interpretation" of the term "foundation" in the Policies is that it includes the home's concrete basement walls.

Plaintiff has argued that the last antecedent rule does not apply because some, but not all, of the Policies separate the modifying phrase "which are below the undersurface of the lowest basement floor" from the terms "excavations, footings, foundations, piers, or any other structures or devices" with a comma. See Plaintiffs' Opposition to Amica's Motion to Dismiss at pg. 7. In denying Amica's Motion to Dismiss this Court also noted that "where a qualifying phrase is separated from preceding phrases by means of a comma, 'one may infer that the qualifying phrase is intended to apply to all of its antecedents, not only the one immediately preceding it.' " Roberge v. Amica Mut. Ins. Co., 2015 WL 9480008 (D. Conn. Dec. 29, 2015) *quoting* State v. Rodriguez-Roman, 297 Conn. 66, 77 (2010). Assuming *arguendo* that Plaintiff is correct and that the "last antecedent rule" does not apply, the language of the Policies *still*

requires that foundations exist *above* the "the undersurface of the lowest basement floor." If foundations *only* existed below the basement floor, as argued by the Plaintiff, then the Policies' use of the qualifying phrase "below the undersurface of the lowest basement floor" would be improperly "eliminated as meaningless." <u>Downs</u>, 146 Conn. at 495. There would be no need to modify the phrase "foundation" by use of the phrase "below the undersurface of the lowest basement floor" if a "foundation" could not exist *above* the "lowest basement floor." Accordingly, under any "reasonable interpretation" of the Policies, the a "foundation" must exist *above* the "lowest basement floor."

### b. The Policies operative after July 26, 2006 provide even further support of this conclusion as they specifically, and repeatedly, delineate between the terms "footing" and "foundation."

The Policies that were operative from July 26, 2006 provide even further evidence of this contractual intent – namely that the term "foundation" includes the Property's basement walls, but not a "footing" – because the Policies specifically and repeatedly distinguish between the terms "foundation" and "footing." Therefore any argument by the Plaintiffs that those terms mean the same thing fails. <u>Downs</u>, 146 Conn. at 495 ("A policy is to be taken as a whole and all its relevant provisions considered in connection with each other ... Every provision is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it.") (citations omitted).

The post-July 26, 2006 Policies' explicit distinctions between "foundation" and "footing" is found in the "PERILS INSURED AGAINST" portion of the Policy which, in

part, excludes coverage for loss caused by freezing to a "*footing, foundation*...." and for loss caused by "settling, shrinking, bulging or expansion, including resultant cracking, of ... *footings, foundations*..." SOF ¶¶ 54, 55.  Accordingly, the Policies makes clear that a "footing" is separate and distinct from a "foundation."

Accepting Plaintiffs' argument that "foundation" could refer to the "footings" of the home would "eliminate[] as meaningless, or disregard[] as inoperative" the Policy's repeated specific distinctions between the term "foundation" and "footing," despite the fact that a "reasonable meaning consistent with the other parts of the policy can be given to" this explicit distinction. <u>Downs</u>, 146 Conn. at 490. Plaintiffs' argument would contradict Connecticut rules of insurance policy interpretation and is therefore not "reasonable" as a matter of law. <u>Id.</u>; <u>A.M. Larson</u>, 153 Conn. at 622. Conversely, Amica's interpretation of the term "foundation," which this Court has previously acknowledged is reasonable, <u>see</u> <u>Roberts</u>, <u>Gabriel</u>, <u>Belz</u>, <u>Karas</u>, <u>Bacewicz</u>, <u>Karas</u>, <u>supra</u>, does not "eliminate[] as meaningless, or disregard[] as inoperative"  the Policy's explicit distinction between the terms "footing" and "foundation."

### c.  Plaintiffs have not claimed damages for an "ensuing loss."

In <u>Roberts</u>, <u>supra</u>, this court noted that even if the insurer's proffered definition of "foundation" in that case was accepted, the Roberts claim would still survive summary judgment because there could theoretically be coverage under the Liberty Mutual policies for an "ensuing loss to property." 2017 WL 3710062 at **12-13. In the present case, however, Plaintiffs' seek no such damages, and accordingly summary judgment in favor of Amica is appropriate. <u>Ex. 21</u> at Answer 12 (stating that with

22

respect to damage to the Property Plaintiffs seek only "the cost of the complete removal and replacement of the basement walls of our home").

In light of the above, the correct, and only "reasonable," interpretation of the term "foundation" in the Policies is the simplest interpretation.  "Foundation" refers to "the whole masonry substructure of a building," which includes the concrete walls which extend from first floor of the home to the ground, whether the home has a basement or not. See Merriam-Webster, supra. Accordingly, Plaintiffs' claims for a "collapse" of their "basement walls"/"foundation" fails as a matter of law.

## II. ALTERNATIVELY, JUDGMENT SHOULD ENTER IN AMICA'S FAVOR BECAUSE (1) PLAINTIFFS' CLAIMED LOSS DOES NOT MEET THE DEFINITION OF "COLLAPSE" UNDER THE POST-JULY 26, 2006 POLICIES, AND (2) PLAINTIFFS CANNOT PRODUCE ANY EVIDENCE TO DEMONSTRATE THAT A "SUBSTANTIAL IMPAIRMENT TO THE STRUCTURAL INTEGRITY" OF THEIR BASEMENT WALLS EXISTED PRIOR TO JULY 26, 2006, THEREBY DEFEATING THEIR CLAIM FOR COVERAGE UNDER THE PRE-JULY 26, 2006 POLICIES.

### a. Connecticut state and Federal courts have repeatedly held that Plaintiffs' claims fail as a matter of law under the Amica Policies that were operative on or after July 26, 2006 because (1) the claimed damage was not "abrupt," and (2) Plaintiffs cannot demonstrate that "the [home] or any part of the [home] cannot be occupied for its intended purpose," as a result of the claimed damage. England, Toomey, Miller, Clough, Adams, Agosti, Celentano, Alexander, Metsack, Piacentini, Jemiola, supra.

The Amica Policies issued after July 26, 2006 provide "collapse" coverage for "abrupt collapse," which is defined as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purposes." SOF ¶¶54, 55. This Court has repeatedly held that Plaintiffs' claim for insurance coverage under the terms of the post July 26, 2006

Policies fails as a matter of law.   England, Celentano, Mazzarella, supra; see Miller, Clough, Adams, Agosti, Metsack, Alexander, supra. The Connecticut state courts agree. Toomey, Jemiola, supra.

In Alexander v. General Ins. Co. of America, No. 3:16-cv-00059 (SRU) (July 7, 2016), this Court held as follows:

> I'm going to grant the motion to dismiss in its entirety. The coverage issue I think is the one that's taken up the bulk of the argument today, and that's, I think, clearly barred; that is, coverage is barred by the terms of the collapse provision in the policy...
>
> So there's several problems for the plaintiff given the allegations in the complaint here. The first is that there has been no abrupt falling down or caving in of a building or any part of a building for which coverage applies, and there's not been a clear allegation that any building or part of a building cannot be occupied for its intended purpose.
>
> Even if that had been met, what we have here is a building that is in danger of falling down, and that is expressly excluded from collapse coverage; and similarly, there has been cracking bulging, etc. Those situations are also excluded ...

Ex. 22 at 22:7- 23:25. On reconsideration, this Court reaffirmed its decision:

> Plaintiffs cannot avoid the fact that their basement walls are still standing. The only allegations of impairment to the structural integrity of the walls are allegations that the walls are "cracking" or—alleged at oral argument—that they are "bulging." Both conditions are expressly excluded under the definition of the policy and it is clear that no collapse has occurred.

Alexander v. General Ins. Co. of America, 2017 WL 188134 (D. Conn. Jan. 17, 2017).

This Court, along with several other jurisdictions, has held that the definition of "collapse" set forth in the Policy is not ambiguous. England, 2017 WL 3996394, *5 (Holding that the "collapse" language in the Amica policies "unambiguously require an abrupt event for collapse coverage to apply"); Celentano, supra (allowing motion to

dismiss on same "collapse" language); See Ex. 21, at 22:10-12; Metsack, 2017 WL 706599 (D. Conn. Feb. 21, 2017); Jemiola, supra; see also Miller v. First Liberty Ins. Corp., 2008 WL 2468605, *4 (E. D. Penn. June 17, 2008) (ruling, in a case involving the nearly identical language to definition of "collapse" in the Policy, "that the collapse provision of the Policy is unambiguous…"); Residential Management (N.Y.) Inc. v. Federal Ins. Co., 2012 WL 3288671, *9 (E.D.N.Y. Aug. 10, 2012) (holding that nearly identical policy language defining collapse is not ambiguous); Mount Zion Baptist Church of Marietta v. GuideOne Elite Ins. Co., 808 F.Supp.2d 1322, 1325 (N.D.Ga. Apr. 19, 2011) (holding nearly identical policy language defining collapse is not ambiguous); Rector St. Food Enterprise, LTD. v. Fire & Cas. Ins. Co. of Connecticut, 35 A.D.3d 177, *1, 827 N.Y.S.2d 18 (2006) (collapse was unambiguous when defined in policy).

In Jemiola, the Connecticut State Superior Court for interpreted nearly identical "collapse" language to that set forth in the post July 26, 2006 Amica insurance policies at issue in this case, in a nearly identical factual situation to that at issue here, and held that the plaintiff's claim for coverage under the "collapse" provision of the policy failed as a matter of law because (1) "there has been no sudden or abrupt falling down or caving in," and (2) "the plaintiff's home can still be occupied 'for its intended current purposes.'" 2017 WL 1258778 at *11.   The Court explicitly "agree[d] with the Connecticut Federal District Court in Alexander and the other courts around the country that have held that the definition of collapse in the policy is unambiguous as applied to circumstances similar to this case." Id. at *10.

On February 21, 2017, this Court entered judgment in favor of Allstate Insurance

Company in <u>Metsack et al. v. Liberty Mut. Fire Ins. Co.</u>, 2017 WL 706599, *9 (D. Conn. Feb. 21, 2017). There the parties agreed that a "chemical reaction" caused concrete in the Plaintiff's basement walls to "expand and crack." <u>Id.</u> at *1. Plaintiff sought coverage under the "collapse" provision of the Allstate policy. <u>Id.</u> The Allstate policy required that a "collapse be 'a sudden and accidental direct physical loss'" in order for the insured to be entitled to coverage. <u>Id.</u> at *7. The Court entered judgment in favor of Allstate on plaintiff's breach of contract, bad faith, and CUIPA/CUTPA claims because the "basement walls deteriorated over time, rather than 'suddenly,'… [.]" <u>Id.</u> at *8.

The Policies are explicit that in order for the Roberges to be entitled to coverage there must be "an abrupt falling down or caving in of a building or any part of a building." SOF ¶¶ 54, 55.  The term "abrupt" is defined as "very sudden and not expected." <u>See</u> Merriam-Webster.com Merriam-Webster, n.d. Web. 29 Sept. 2015. http://www.merriam-webster.com/dictionary/abrupt (defining "abrupt" as "very sudden and not expected"); <u>see also</u> <u>New London Country Mut. Ins. Co. v. Zachem</u>, 145 Conn. App. 160, 166 (2013) ("To determine the common, natural, and ordinary meaning of an undefined term, it is proper to turn to the definition found in a dictionary"). Plaintiffs can offer no evidence that an abrupt collapse as occurred.

The Amica Policies also require that an insured demonstrate that there was "an abrupt falling down or caving in of a building or any part of a building *with the result that the building or part of the building cannot be occupied for its current intended purpose*" in order to demonstrate an entitlement to coverage. SOF ¶¶54, 55 (emphasis supplied). However, the evidence shows that (1) Plaintiffs have occupied the Property

since they purchased it in 1993, (2) no one has ever advised them they should leave the home, (3) their use of the home has not been limited in any way, (4) since discovering the cracks in the foundation/basement walls the Property has been occupied by Plaintiffs  in the same manner as before, (5) and the condition of the foundation/basement walls has not affected Plaintiffs' ability to use their home on a day-to-day basis. SOF ¶¶36-40. Moreover, the Roberges expert testified that after he inspected the home, he considered the home safe to reside in, and that the foundation was functioning in terms of supporting the home.  See Ex. 17 at pg. 89:9-21.

In short, Plaintiffs have not presented sufficient evidence to establish a genuine issue of material fact regarding whether there has been an "abrupt falling down or caving in" of the Property or part of the Property, or that the Property "cannot be occupied for its intended purpose."  Accordingly, as a matter of law, Plaintiffs are not entitled to coverage under the post-July 26, 2006 Policies.

**b.    There is no coverage under any pre-July 26, 2006 Policies because Plaintiffs cannot produce any evidence to demonstrate that there was a "substantial impairment to the structural integrity" of the basement walls prior to July 26, 2006. Jemiola, supra.**

Assuming *arguendo* that the Policies provided coverage for "collapse" to the Plaintiffs' foundation/basement walls, but see Argument - Section I, supra, Plaintiffs are still not entitled to coverage under any Policy *before* July 26, 2006 because they cannot present any evidence from which a fact finder could conclude that a "substantial impairment to structural integrity" of their basement walls occurred prior to July 26, 2006. Jemiola, 2017 WL 1258778 at *5 (granting summary judgment for insurer and

holding that in the absence of eye-witness or expert testimony plaintiff claiming insurance coverage for "collapse" of basement walls fails to raise a genuine issue of material fact regarding when a "substantial impairment to structural integrity" occurred); see Brooks v. Powers 165 Conn. App. 44, 57 (2016) ("testimony that is too speculative, too conjectural to support a judgment for the plaintiff at trial cannot serve as a basis for opposition to a motion for summary judgment.")

For Plaintiffs' Complaint to survive under polices issued before July 26, 2006, they must be able to present proof that (1) there was a "substantial impairment in the structural integrity" of the concrete basement walls, Beach v. Middlesex Mutual Assurance Co., 205 Conn. 246, 252 (1987)(holding that for policies which include the "collapse" language in the pre-July 26, 2006 Policies, collapse is defined as "substantial impairment in the structural integrity of a building") and (2) that any such "substantial impairment" occurred prior to July 26, 2006. MBIA Inc. v. Federal Ins. Co., 652 F. 3d 152, 158 (2d Cir. 2011) ("the insureds bears the burden of showing that an insurance coverages covers the loss.. [.]") (applying Connecticut law); Jemiola, supra.

Plaintiffs have disclosed the report of expert David Grandpre which opines as to whether there had been a "substantial impairment to the structural integrity" of the property's foundation. See Ex. 16. Although Mr. Grandpre's expert report opines in conclusory unsupported fashion that a "substantial impairment to the structural integrity of the concrete basement walls" had occurred[5], notably missing from his report was *any*

---

[5]    At his deposition Mr. Grandpre testified that there is no "standard or guideline definition" that he relied on to determine that a "substantial impairment" had occurred. Ex. 17 at pg. 85:4-8.

attempt to identify when such substantial impairment occurred. Id. At his deposition it became patently obvious why his disclosure made no such assertion – he is unable to do so. This is fatal to Plaintiffs' claims. At his deposition, Mr. Grandpre's testified as follows:

> Q: [A]re you able to identify a specific date as far as when the Roberge's foundation became substantially impaired?
>
> A: No.
>
> Q: Are you sitting here today able to give an approximate range of when, in your opinion, the foundation became substantially impaired?
>
> A. No.

Ex. 17, at 88:14-22.

Moreover, the Roberges testified at their depositions that the first time they observed cracking in the concrete walls was in late 2008. SOF ¶29. Plaintiffs offer no other potential eyewitnesses who observed cracking in the basement walls prior to the "end of 2008." Ex. 21 at Answer 11.

> Plaintiffs concede in their Opposition to Amica's Motion to Dismiss, that:
>
> a crucial component of the coverage analysis … is a determination, to the extent possible with current scientific methods, the year in which the "collapse" occurred. This timing analysis will require the assistance of expert engineers and, perhaps, other scientists. This timing analysis is necessary to determine what policy provisions apply to the particular collapse loss, in order to judge whether that particular policy covers or does not cover the damage.

See Docket at entry 13, pg. 9-10. Plaintiffs are correct — the timing of when any claimed "substantial impairment" of their basement walls is "crucial" and, indeed, necessary component of their claim for coverage under the pre-July 26, 2006 Policies.

However, Plaintiffs are unable to meet their burden with respect to this "crucial" aspect of their claim, and accordingly judgment must enter for Amica.

The plaintiff in <u>Jemiola</u>, <u>supra</u>, was represented by the same counsel as the Roberges and retained the same expert as the Roberges. That case was another lawsuit in which the plaintiff insured sought coverage for damage to her concrete walls, similar to that claimed here, from an insurer whose policies had changed over time. <u>Id.</u> In that case, Mr. Grandpre, on behalf Ms. Jemiola, testified at his deposition that the Ms. Jemiola's basement walls had been impaired since 1986 when the concrete was poured. <u>Id.</u> at *6.[6] However, Mr. Grandpre's report in that case opined that the "latest point in time" that a "substantial impairment" occurred was when the first eyewitness, the plaintiff, observed cracks in the foundation in October of 2006. <u>Id.</u> In light of this evidence, the Court held "plaintiff has failed to produce admissible counter-evidence to establish a genuine issue of material fact that the loss occurred prior to" the defendant's implementation of the more detailed definition of "collapse" in their insurance policies (which in *this* case is July 26, 2006).  <u>Id.</u>

The same result follows here. Based on the evidence produced to date, the earliest date on which a jury could conclude that the claimed loss occurred would be 2008, when Plaintiffs' claim to have first noticed cracking to the basement walls. Mr. Grandpre was explicit that he has no opinion and cannot even give an "approximate range" of when the "substantial impairment" of the foundation/basement walls occurred.

---

[6]    It is noteworthy that, in contrast, in *this* case Mr. Grandpre testified that Roberges' walls were *not* impaired when it was poured in 1985. <u>Ex. 17</u> at pg. 88:1-5.

Therefore, Plaintiffs cannot meet their burden of establishing a genuine issue of material fact as to whether there was a "substantial impairment" of the basement walls prior to July 26, 2006, and their claim for coverage under the pre-July 26, 2006 Policies fails. Accordingly, as a matter of law, Plaintiffs are not entitled to coverage under the pre-July 26, 2006 Policies.

For the above reasons, even assuming *arguendo* that the Policies provided coverage for "collapse" to Plaintiffs foundation/basement walls, but see Argument – Section I, supra, Plaintiffs' contractual claims still fail and judgment should enter in Amica's favor on Counts I and II of Plaintiffs' Second Amended Complaint as well as Count I of Defendant's Counterclaim.

## III.   JUDGMENT SHOULD ENTER FOR AMICA ON COUNT III OF PLAINTIFFS' COMPLAINT BECAUSE PLAINTIFFS CANNOT ESTABLISH A GENUINE ISSUE OF MATERIAL FACT THAT SUPPORTS A VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

### a.   Because Plaintiffs' contractual claims fail as a matter of law, any bad faith claim is futile as a matter of law.

Plaintiffs' Second Amended Complaint also alleges a violation of the implied covenant of good faith and fair dealing. Ex. 2 at Count II. In Chorches v. Stewart Title Guar. Co., 48 F. Supp. 3d 151 (D. Conn. 2014) this Court held that when a plaintiffs' claim for breach of an insurance contract for wrongfully denying an insurance claim fails, its claims for violations of the underlying covenant of good faith and fair dealing and CUTPA also fail as a matter of law. Specifically the court stated:

> Because plaintiff's contract claim fails, so too does his claim of bad faith denial of coverage. As the Connecticut Supreme Court has recently concluded, "a bad faith action must allege denial of the receipt of an

31

> express benefit under the [insurance] policy." Capstone Bldg. Corp. v. Am.
> Motorists Ins. Co., 308 Conn. 760, 794, 67 A.3d 961, 986 (2013). And the
> underlying covenant of good faith and fair dealing in a contractual
> relationship "is not implicated by conduct that does not impair contractual
> rights." Id. at 795, 67 A.3d 961 (no bad faith claim against insurer for
> failure to investigate an insurance claim where the policy provided the
> insurer sole discretion as to whether to investigate); see also Renaissance
> Mgmt. Co. v. Conn. Hous. Fin. Auth., 281 Conn. 227, 240–41, 915 A.2d
> 290, 297–98 (2007) (defendant housing authority's refusal to help tenants
> by accepting mortgage prepayments did not violate the covenant of good
> faith and fair dealing because the agency was not contractually obligated
> to accept prepayments). Here, because plaintiff has failed to show that
> Coughlin did not receive any benefits to which he was entitled under the
> title policy, his bad faith claim fails by equal measure.

Id. at 157-8. The same rationale applies here.

For the reasons stated above, Plaintiffs contractual claims (Counts I and II of their Complaint) fail. Therefore, Plaintiffs' claim for Violation of the Implied Covenant of Good Faith and Fair Dealing fails because there has been no "impair[ment of] contractual rights," where under the express terms of the contract Plaintiffs are not entitled to insurance coverage. Chorches, 48 F. Supp. 3d at 157.

As this Court noted in Alexander, "[q]uite simply, without coverage there can't be bad faith . . . ." Ex. 22 at 24. Here there is no coverage for Plaintiffs' claims and therefore there "can't be bad faith." Id.

### b. Alternatively, Plaintiffs cannot demonstrate that Amica breached any implied covenants and accordingly Count III fails.

Plaintiffs cannot demonstrate the type of dishonest purpose or sinister motive required to maintain a bad faith claim. "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impede[d] the plaintiff's right to receive benefits that he or she reasonably expected to receive under

the contract must have been taken in bad faith." Alexander v. Strong, 81 Conn. App. 68, 80-81 (2004), citing Gutpa v. New Britain General Hospital, 239 Conn. 574, 598, 687 A.2d 111 (1996). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive …. Bad faith means more than mere negligence; it involves a dishonest purpose." Id. at 81 (quoting Habetz v. Condon, 224 Conn. 231, 237-38 (1992)); see also De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004).

Plaintiffs' allege that Defendant Amica breached its implied duty of good faith and fair dealing by "citing to policy exclusions that are wholly inapplicable to the damage suffered to the basement walls of the Roberges' home," Ex. 2 at ¶3, "intentionally cited policy exclusions wholly inapplicable to the Roberges' claim for coverage knowing full well that the Roberges, like most insureds, are unsophisticated with respect to complex language contained in insurance policies," Id. ¶32, and "acted intentionally to mislead the Roberges and convince them that the damage suffered to their home was not covered solely to preserve its own assets by avoiding payment of a covered loss," Id. ¶33.

Under Connecticut law, "a plaintiff cannot recover for bad faith if the insurer denies a claim that is 'fairly debatable,' i.e., if the insurer had some arguably justifiable reason for refusing to pay or terminating the claim." McCulloch v. Hartford Life & Accident Ins. Co., 363 F.Supp.2d 169, 177 (D.Conn. 2005). Here, for the reasons noted

above, Amica had not only an "arguably justifiable reason" for refusing the claim, but it correctly denied the claim as a matter of law. Furthermore, the Roberges have failed to demonstrate the type of dishonest purpose or sinister motive required to maintain a bad faith claim. Amica retained multiple experts to investigate the claim. SOF ¶43. Amica also retained an attorney to provide them with a coverage analysis prior to rendering a coverage decision. SOF ¶¶48, 49. Moreover, the insureds, Dennis Roberge and Kristi Roberge, offered no testimony or evidence to support the allegation that Amica acted intentionally to mislead the Roberges.[7]

Accordingly Amica is entitled to judgment with respect to Count III of Plaintiffs' Second Amended Complaint because Plaintiffs' cannot demonstrate that Amica acted with the type of dishonest purpose or sinister motive required to maintain this claim.

## IV. JUDGMENT SHOULD ENTER FOR AMICA ON COUNT IV OF PLAINTIFFS' COMPLAINT BECAUSE PLAINTIFFS CANNOT ESTABLISH A GENUINE ISSUE OF MATERIAL FACT THAT SUPPORTS CUTPA AND/OR CUIPA LIABILITY.

### a. Because Plaintiffs' contractual claims fail as a matter of law, their CUTPA/CUIPA claim is futile as a matter of law.

Plaintiffs' Complaint also alleges a violation of the Connecticut Unfair Insurance Practices Act (CUIPA) and the Connecticut Unfair Trade Practices Act (CUTPA). Ex. 2 at Count IV. As noted above, in Chorches, 48 F. Supp. 3d 151, this Court held that when a

---

[7]    Additionally, Plaintiff Kristi Roberge can hardly be characterized as "unsophisticated with respect to complex language contained in insurance policies." Ex. 2 at ¶32. Ms. Roberge, a Chartered Property Casualty Underwriter (CPCU), has been employed with Hartford Steam Boiler Inspection and Insurance Company for over thirty years, the last 8-10 as Vice President of Inward Contracts and Administration, and is an active participant with her husband in handling Plaintiffs' insurance matters. See Ex. 27, at pgs.11:11-24, 12:2-4, 12:11-15, 13:18-22; 14:20-23; 23:22-24.

plaintiff's claim for breach of an insurance contract for wrongfully denying an insurance claim fails, its claim for violations of the underlying covenant of good faith and fair dealing and CUTPA also fails as a matter of law.

Therefore, where, for the reasons stated above, Plaintiffs contractual claims fail, Plaintiffs' claim for Violation of the Connecticut Unfair Trade Practices Act (CUTPA) and the Connecticut Unfair Insurance Practices Act (CUIPA) also fail because there has been no "impair[ment] of contractual rights." Chorches, 48 F. Supp. 3d at 157.

**b.      Alternatively, Plaintiffs cannot show that Amica violated CUTPA and/or CUIPA and Amica is entitled to judgment on Count IV.**

Plaintiffs cannot produce evidence which creates a genuine issue of material fact as to whether Amica violated CUTPA and/or CUIPA and therefore judgment should enter for Amica on Count IV of Plaintiff's Complaint.

CUIPA does not provide a private right of action.   Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 119 (2d Cir. 2001).  Instead, Plaintiffs asserting a claim for unfair insurance practices must do so through CUTPA to state a CUIPA/CUTPA claim. Conn. Gen. Stat. § 42-110a et seq.;  See State of Conn. v. Acordia, Inc., 310 Conn. 1, 37 (2013); Mead v. Burns, 199 Conn. 651, 663 (1986).

CUIPA is to be construed narrowly.   Mead, 199 Conn. at 658-59.   As the Connecticut Supreme Court has ruled, the legislature intended CUIPA to "occupy the field" in defining unfair insurance practices in Connecticut.  State v. Acordia, 310 Conn. 1, 26 (2013).   Thus, allegedly unfair practices in the insurance industry are not actionable unless the defendant's conduct violates a specific provision of CUIPA or,

arguably,[8] another statute regulating specific insurer conduct. <u>Acordia</u>, 310 Conn. at 37; <u>see also</u> <u>Nazami v. Patrons Mut. Ins. Co.</u>, 280 Conn. 619, 625 (2006) ("In order to sustain a CUIPA cause of action under CUTPA, a plaintiff must allege conduct that is proscribed by CUIPA.").

Also, as provided by the statute, an insurer can be held liable for unfair settlement practices under CUIPA only when it engages in specifically prohibited acts "with such frequency as to indicate a general business practice." Conn. Gen. Stat. §38a-816; <u>Lees v. Middlesex Ins. Co.</u>, 229 Conn. 842, 848 (1994) (the legislature has manifested a clear intent to except from coverage under CUIPA isolated instances of insurer misconduct).

Here, Plaintiffs allege that "Amica has regularly been engaged, as part of its general business practice, in refusing to attempt in good faith to effectuate prompt, fair and equitable settlements of concrete decay claims in which liability has become reasonably clear." <u>Ex. 2</u> at ¶49. "Amica's participation in the insurance industry wide practice of denying coverage for concrete decay claims as a part of its general business practice is further confirmed by its refusal to provide coverage in at least one (1) other instance involving other homeowners experiencing the same damage caused by the same mechanism and involving policy language identical to that in the Roberges' policies. See <u>Francis J. Boucher, Jr., et al. v. Amica Mut. Ins. Co.</u>, Tolland Superior Court Docket No. TTD-CV-12-6004826-S." <u>Ex. 2</u> at ¶50.

---

[8]      In <u>Acordia</u>, the Connecticut Supreme Court left open the possibility, without deciding, that there could "arguably" exist "some other statute regulating a specific type of insurance related conduct" that could give rise to CUTPA liability.  <u>Id</u>.  No such claim is presented here.

Proving that a "general business practice" requires more than merely asserting the practice exists or citing other unrelated cases supposedly contending the same types of claims and alleging bad faith allegations.  See Ferrante v. Allstate Prop. & Cas. Ins. Co., 2011 WL 3890988, at *2 (Conn. Super. Jul. 21, 2011) (string citing cases asserting bad faith allegations "represents only a legal conclusion and does not constitute proper fact pleading"); see also Charter Oak Fire Ins. v. Blue Sky Part., 2001 WL 1178318 (Conn. Super. Aug. 30, 2001) (motion to strike granted where allegations of general business practice were based on three pending lawsuits); Ellison v. Great Am. Spirit Ins. Co., 2006 WL 3491242 (Conn. Super. Nov. 8, 2006) ("Merely alleging that other lawsuits have been filed against the defendants is insufficient."); Rams II, LLC v. Mass. Bay Ins. Co., 2015 WL 3554789 (Conn. Super. May 11, 2015) ("[C]itations to other cases in a cause of action attempting to plead a general business practice in violation of CUIPA are proper only if the decision maker in those cases found the defendant to be in violation of CUIPA.").

Plaintiffs can point to no case where a Plaintiff who has brought a similar claim against Amica - to wit a claim for "collapse" coverage arising out of damage to concrete poured by J.J. Mottes in Tolland County - has *succeeded* on a breach of contract claim, declaratory judgment claim, CUTPA and/or CUIPA claim, or implied covenant claim against Amica. In fact, even in the case cited in Plaintiff's Complaint, Boucher v. Amica Mut. Ins. Co., Tolland Superior Court Docket No. TTD-CV-12-60004826-S, although Defendant's motion for summary judgment in state court was not allowed, no finder of fact found Amica liable for the claims brought by the Bouchers. Additionally, judgment

has entered in Amica's favor and/or Amica's motions to dismiss have been allowed in a number of cases involving similar claims to those brought by Plaintiffs here. See e.g. England v. Amica Mut. Ins. Co., 2017 WL 3996394 (D. Conn. Sept. 11, 2017); Celentano v. Amica Mut. Ins. Co., No. 3:17-00359 (JAM) at entry 53; Mazzarella v. Amica Mut. Ins. Co., No. 3:17-00598(SRU) at entry 33; Roberts v. Amica, 2015 WL 7458510 (D. Conn. Nov. 24. 2015) (denying Plaintiff's motion for reconsideration of court's dismissal of Plaintiff's complaint on statute of limitations grounds). Even in the present case, in ruling on Amica's Motion to Dismiss, this Court recognized that Amica "may have a strong argument in its favor." Roberge, 2015 WL 9480008 at *3.

The Roberges cannot provide evidence sufficient for a fact finder to conclude that Amica has regularly been engaged, as part of its general business practice, in refusing to attempt in good faith to effectuate prompt, fair and equitable settlements of concrete decay claims in which liability has become reasonably clear.  Likewise, Plaintiffs cannot provide evidence sufficient for a fact finder to conclude that Amica has engaged in a prohibited "general business practice."

Moreover, Amica's denial of Plaintiffs' claim, without more, also does not support CUIPA liability.  Contesting coverage is not an unfair insurance practice under CUIPA even if the insurer's interpretation is ultimately unsuccessful. Further, the act does not become unfair simply because an insurer is faced with more than one claim.  Instead, CUIPA prohibits an insurer from engaging in the general business practice of "not attempting *in good faith* to effectuate prompt, fair and equitable settlements of claims

in which liability *has become reasonably clear*."   Conn. Gen. Stat. § 38a-816(6)(F) (emphasis added).[9]

Plaintiffs have not demonstrated and cannot demonstrate sufficient evidence to show that the Defendant's coverage position is unfair under CUIPA. For the reasons noted above, Defendant's coverage position is not only reasonable, but correct. At a minimum, as Judge Underhill recently stated during oral argument on a summary judgment motion in Roberts v. Liberty Mutual Fire Ins. Co., Civil Docket No. 13-CV-00435 (SRU): this is "an issue about which reasonable people can disagree.  In other words, it's not a frivolous argument to say the collapse of a building means something different than cracks in your basement". Ex. 23 at pgs. 4-5. Advancing a coverage position about which "reasonable people can disagree" is not bad faith. Plaintiffs' summary allegations without any evidence do not alter that conclusion. Accordingly, judgment should enter in Amica's favor on Count IV of Plaintiffs' Second Amended Complaint.

---

[9]    See also Kim v. State Farm and Cas. Co., No. 3:15-CV-879, 2015 WL 6675532, *4 (D. Conn. Oct. 30, 2015) ("That Plaintiffs disagree with Defendant's belief that these provisions of the Policy bar coverage does not evince bad faith sufficient to support a breach of the implied duty of good faith and fair dealing, or to otherwise suggest that the Defendant acted in 'an arbitrary and unfounded manner.'"); Lee v. AIG Cas. Co., 919 F. Supp. 2d 219, 233 (2013) ("[t]o contest a legal argument in the courts is not a reckless act, even when the law may eventually be construed unfavorably to the contesting party"); L.A. Limousine, Inc. v. Liberty Mut. Ins. Co., 509 F. Supp. 2d 176, 182 (D. Conn. 2007) ("[an insurer] has a right to defend itself against claims asserted in courts of law, and should not be made fearful of doing so for violating CUIPA's general business practice provision"); Martin v. Am. Equity Ins. Co., 185 F. Supp. 2d 162, 165 (D. Conn. 2002) ("Although plaintiff has included naked, conclusory allegations as to the legal status of defendant's acts, plaintiff never specifies how or in what manner defendant's denial of coverage or its refusal to provide her with a defense was 'unreasonable, outrageous, malicious and done in bad faith.'").

## CONCLUSION

For the above reasons, Defendant Amica Mutual Insurance Company moves that judgment enter in its favor on all counts in the Plaintiffs' Second Amended Complaint and Defendant's Counterclaim for Declaratory Judgment.

Respectfully Submitted,
For the Defendant,
Amica Mutual Insurance Company,
By its attorneys,

*/s/ Christopher M. Reilly*

_____
Anthony J. Antonellis, Jr., BBO# 557964
Christopher M. Reilly, BBO# 674041
SLOANE & WALSH, LLP
Three Center Plaza, 8th Floor
Boston, MA 02108
P: (617) 523-6010
F: (617) 227-0927
AAntonellis@sloanewalsh.com
CReilly@sloanewalsh.com

Date:  September 14, 2017

## CERTIFICATE OF SERVICE

I, Christopher M. Reilly, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

 /s/   Christopher M. Reilly
Christopher M. Reilly

1172550.1